

# SUPREME COURT OF MISSOURI
## en banc

Carla Baker,                                )

                                   )

           Respondent,           )

                                   )

vs.                                )      No. SC93451

                                 )

Bristol Care, Inc., d/b/a Bristol Manor,  )

and David Furnell,             )

                                 )

           Appellants.          )

### APPEAL FROM THE CIRCUIT COURT OF DEKALB COUNTY
Honorable R. Brent Elliott, Judge

### *Opinion issued August 19, 2014*

Bristol Care Inc. and David Furnell (Appellants) appeal an order overruling their motion to compel arbitration. They contend that the circuit court erred by not compelling arbitration because the arbitration agreement between Bristol and its employee, Carla Baker, is valid and enforceable.

This Court affirms the circuit court's order because there was no consideration to create a valid arbitration agreement.[1] First, Baker's continued at-will employment does not provide consideration for the arbitration agreement. Second, the fact that Bristol retroactively could modify, amend or revoke the agreement means that Bristol's promise

---

[1] The lack of an enforceable arbitration agreement between Bristol and Baker renders it unnecessary to consider the remaining points on appeal. Those points consist of Appellants' argument that the agreement was not unconscionable and that it did not apply to Furnell as Bristol's president.

to arbitrate is illusory and does not constitute consideration for Baker's agreement to arbitrate.

## FACTS

Bristol promoted Baker from her position as an hourly employee to a salaried managerial position at one of Bristol's long-term care facilities. Bristol drafted an employment agreement and arbitration agreement for Baker to sign. The parties signed the agreements contemporaneously at the time of Baker's promotion.

The employment agreement provided that Baker's employment would "continue indefinitely" unless Baker gave 60 days notice or Bristol elected to terminate her employment in one of four ways: (1) with five days' written notice "at [Bristol's] sole option;" (2) without notice if Bristol paid Baker five days' compensation; (3) without notice if, in Bristol's "sole opinion," Baker violates the employment agreement in a way that "jeopardizes the general operation of the facility or the care, comfort or security of its residents;" or (4) without notice for "dishonesty, insubordination, moral turpitude or incompetence." The employment agreement also provided that Baker would receive increased pay and employment benefits, including a license to live in the facility rent-free.

The arbitration agreement provides that all legal claims the parties may have against one another will be resolved by binding arbitration. The arbitration agreement provides that consideration consists of Baker's continued employment and mutual promises to resolve claims through arbitration. Section 3 of the arbitration agreement, titled "Employment-At-Will," provides:

> This Agreement is not, and shall not be construed to create, a contract of employment, express or implied, and does not alter Employee's status as an at-will employee. Notwithstanding this Agreement, either Employee or Company can terminate the employment . . . at any time, for any reason, with or without cause at the option of the Employee or the Company.

Finally, the arbitration agreement provides that Bristol specifically "reserves the right to amend, modify or revoke this agreement upon thirty (30) days' prior written notice to the Employee."

Bristol terminated Baker from her position as administrator of the long-term care facility. Baker filed a class action lawsuit against Appellants seeking compensation for allegedly unpaid overtime hours. Appellants filed a motion to compel arbitration. The circuit court overruled the motion. This appeal followed.

## ANALYSIS

Section 435.440, RSMo 2000,[2] provides that an appeal may be taken from an order denying an application to compel arbitration made under section 435.355. The order denying Bristol's motion to compel arbitration is appealable.

### I. Validity of the arbitration agreement is determined by the courts

Appellants assert that the arbitrator should decide any questions of enforceability because both Bristol Care and Baker agreed to have the arbitrator do so in the arbitration agreement. The arbitration agreement provides: "The arbitrator has exclusive authority to resolve any dispute relating to applicability or enforceability of this Agreement."

---

[2] All references to statutes are to RSMo 2000.

Appellants rely on *Rent-A-Ctr, W., Inc. v. Jackson*, 130 S. Ct. 2772 (2010). In *Rent-A-Center*, the arbitration agreement provided that the arbitrator "shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability *or formation* of this Agreement." *Id*. at 2775. (Emphasis added). The employee argued that the agreement was not enforceable because it was unconscionable under Nevada law. *Id.* The United States Supreme Court held that the delegation provision vested the arbitrator, not the courts, with the authority to determine whether the agreement was unconscionable. *Id.* at 2778-79.

The arbitration agreement in this case provides that the arbitrator will resolve disputes "relating to the applicability or enforceability" of the agreement. Unlike the agreement at issue in *Rent-A-Center,* the arbitration agreement in this case does not delegate to the arbitrator disputes regarding contract formation. A dispute "relating to the applicability or enforceability" of the agreement presupposes the formation of a contract. Baker's argument that there was no consideration to create a valid agreement raises a contract formation issue rather than an applicability or enforceability issue.

Although federal law preempts state laws that invalidate arbitration agreements on public policy grounds, state courts are permitted to apply state law defenses to the formation of the particular contract at issue. *Brewer v. Missouri Title Loans*, 364 S.W.3d 486, 492 (Mo. banc 2012); *Robinson v. Title Lenders, Inc*., 364 S.W.3d 505, 510 (Mo. banc 2012). Baker's claim raises a contract formation issue that is subject to resolution by Missouri state courts.

4

## II. Validity of Arbitration Agreement

The issue of whether arbitration should be compelled is a question of law subject to de novo review. *State ex rel. Vincent v. Schneider*, 194 S.W.3d 853, 856 (Mo. banc 2006). "Missouri contract law applies to determine whether the parties have entered a valid agreement to arbitrate." *Id.* "The essential elements of any contract, including one for arbitration, are "'offer, acceptance, and bargained for consideration.'" *Johnson v. McDonnell Douglas Corp.*, 745 S.W.2d 661, 662 (Mo. banc 1988). Consideration "consists either of a promise (to do or refrain from doing something) or the transfer or giving up of something of value to the other party." *Morrow v. Hallmark Cards, Inc.*, 273 S.W.3d 15, 25 (Mo. App. 2008).

Appellants argue that there are two sources of consideration for the arbitration agreement: (1) Baker's promotion, continued employment and attendant benefits; and (2) Bristol's promise to arbitrate its claims arising out of the employment relationship between it and Baker and to assume the costs of arbitration. "If two considerations are given for a promise, one of them being legally sufficient to support a promise and the other not sufficient, the promise is enforceable." *Earl v. St. Louis Univ.*, 875 S.W.2d 234, 236-237 (Mo. App. 1994) (citing 1 Corbin on Contracts, § 126 (1963)). The arbitration contract, therefore, is enforceable if either source of consideration is valid.

### A. Continued Employment

Bristol argues that Baker's acceptance of continued employment, with the attendant increase in salary and benefits, plus the limits on Bristol's right to terminate her employment, constitute consideration to support the arbitration agreement. Baker argues

5

that her employment remained at-will and that continued at-will employment does not constitute valid consideration to support the arbitration agreement.

The Missouri Court of Appeals has held that continued at-will employment is not valid consideration to support an agreement requiring the employee to arbitrate his or her claims against the employer. *See,* e.g*., Whitworth v. McBride & Son Homes, Inc.*, 334 S.W.3d 730, 741 (Mo. App. 2011); *Frye v. Speedway Chevrolet Cadillac*, 321 S.W.3d 429, 438-439 (Mo. App. 2010); *Morrow*, 273 S.W.3d at 26.  An offer of continued at-will employment is not valid consideration because the employer makes no legally enforceable promise to do or refrain from doing anything it is not already entitled to do. The employer still can terminate the employee immediately for any reason. *Morrow,* 273 S.W.3d at 26-27.  While the federal courts have reached a different result, this Court rejects that approach and, instead, adopts the analysis employed by *Morrow* and subsequent court of appeals cases, which hold that continued at-will employment is not valid consideration to create an enforceable contract.[3]  The issue becomes whether the employment and arbitration agreements altered Baker's status as an at-will employee.

The at-will employment doctrine is well-established in Missouri law. *Margiotta v. Christian Hosp. Ne. Nw.*, 315 S.W.3d 342, 345 (Mo. banc 2010) (citing *Johnson v. McDonnell Douglas Corp.*, 745 S.W.2d at 661).  Absent an employment contract with a

---

[3] The principal federal case is *Berkley v. Dillard's Inc.*, 450 F.3d 775, 777 (8th Cir. 2006). In *Berkeley*, the Eighth Circuit held that continued employment constitutes consideration and acceptance sufficient to create an enforceable contract.  Subsequent federal district court cases have followed *Berkely*.  *See Canterbury v. Parsons Constructors, Inc.,* 2009 (W.D. Mo. March 27, 2009) (expressly declining to follow *Morrow* and holding, consistent with *Berkeley*, that continued employment is adequate consideration to create an enforceable arbitration agreement).

"definite statement of duration ... an employment at will is created." *Id.* citing *Luethans v. Washington Univ.*, 894 S.W.2d 169 (Mo. banc 1995)). An employer may terminate an at-will employee "for any reason or for no reason." *Id.* (citing *Crabtree v. Bugby*, 967 S.W.2d 66, 70 (Mo. banc 1998)). Key indicia of at-will employment include indefinite duration or employment and the employer's option to terminate the employment immediately without cause.

The employment agreement provides that Baker's employment will "continue indefinitely" unless Bristol elected to terminate Baker by giving her five days' written notice "at [Bristol's] sole option" or terminating her without notice and paying Baker five days' compensation. The employment agreement permits Bristol to terminate Baker immediately without notice for any reason by paying her what amounts to a severance package worth five days' pay. There is no guaranteed duration of employment. The lack of a defined duration of employment is consistent with at-will employment.

The arbitration agreement drafted by Bristol confirms that the parties understood that Baker was an at-will employee. Section 3 of the arbitration agreement provides that the agreement "does not alter Employee's status as an at-will employee." The agreement then provides that "[n]otwithstanding this Agreement, either Employee or Company can terminate the employment . . . at any time, for any reason, with or without cause at the option of the Employee or the Company." These provisions amount to an unequivocal, positive representation by Bristol that Baker's status is that of "an at-will employee." Under these facts, Baker is an at-will employee. The various promises that the parties exchanged were all incidents of Baker's continued at-will employment. Neither Baker's

continued at-will employment nor the incidents of that employment provide consideration supporting an obligation to arbitrate disputes with Bristol.

Bristol asserts that the statement in the arbitration agreement providing that Baker is "an at-will employee" does not govern because the arbitration agreement is a dispute resolution document, not an employment agreement. As noted, Bristol drafted an employment agreement and an arbitration agreement for Baker to sign. The parties acknowledge that the agreements were executed contemporaneously. Documents that are executed contemporaneously are considered together as a single agreement. *State ex rel Johnson v. JF Enterprises, LLC*, 400 S.W.3d 763, 764 (Mo. banc 2013). If possible, all provisions in the various documents should be harmonized in order to effectuate the parties' intent. *Id.* at 770 (citing, *J. E. Hathman, Inc. v. Sigma Alpha Epsilon Club,* 491 S.W.2d 261, 264 (Mo. banc 1973)). When considered together, as one agreement, Bristol's argument amounts to an effort to disclaim its specific statement that Baker's employment was at-will as well as the fact that Bristol retained the right to terminate Baker's employment at any time for any reason. Baker was an at-will employee and remained so after she signed the employment and arbitration agreements.

Bristol also asserts that Baker's entitlement to severance pay following termination without notice constitutes consideration above and beyond continued at-will employment. Even if Baker had legal recourse to recover her severance pay, the fact remains that her term of employment was indefinite, Bristol retained the right to terminate her employment immediately without cause, Baker had no recourse to challenge her termination beyond the legally recognized exceptions to the at-will

8

employment doctrine, and Bristol affirmatively and unequivocally stated that Baker's status is that of "an at-will employee." Under these circumstances, the obligation to pay severance is not sufficient to alter Baker's status as an at-will employee. *See Karzin v. Collet*, 562 S.W.2d 397, 400 (Mo. App. 1978) (indicating that employment was at-will when employee was entitled to severance but could be fired immediately without cause). Baker's severance pay was a term and condition of her at-will employment.

### B. Mutual Promises to Arbitrate

Appellants contend that the arbitration agreement also is supported by mutual promises to arbitrate. As the dissent explains at length, bilateral contracts are supported by consideration and enforceable when each party promises to undertake some legal duty or liability. *Sumners v. Serv. Vending, Co., Inc.*, 102 S.W.3d 37, 41 (Mo. App. 2003). These promises, however, must be binding, not illusory. *Id.* A promise is illusory when one party retains the unilateral right to amend the agreement and avoid its obligations. *Morrow,* 273 S.W.3d at 25.

In this case, Bristol's alleged mutual promise to arbitrate is conditioned on Bristol's unilateral "right to amend, modify or revoke this agreement upon thirty (30) days' prior written notice to the Employee." The quoted language does not limit Bristol's authority to modify the arbitration agreement unilaterally and retroactively. If Bristol retains unilateral authority to amend the agreement retroactively, its promise to arbitrate is illusory and is not consideration.[4]

---

[4] The dissent lists the various arbitration promises that both parties made. The list is accurate. The list overlooks the fact that each of these arbitration-related promises is subject to unilateral

Bristol asserts that the requirement of prior written notice means that any modifications must apply prospectively only. The fact that Bristol must give prior written notice of an amendment to the arbitration agreement does not preclude Bristol from giving Baker prior written notice that, effective in thirty days, Bristol retroactively is disclaiming a promise made in the arbitration agreement. For instance, if in the course of an ongoing arbitration process, Bristol concluded that the process was not favorable, Bristol could provide Baker notice that, effective in 30 days, it no longer would consider itself bound by the results of the arbitration. While the dissent concludes summarily that no court would adopt a construction of the agreement allowing Bristol to disclaim or modify its arbitration promises unilaterally at any time for its own benefit, the fact remains that the language of the agreement would permit Bristol to do just that.

Appellants cite *Pierce v. Kellogg, Brown & Root, Inc.*, 245 F.Supp. 2d 1212, 1215-16 (E.D. Okla. 2003) for the proposition that the notice requirement in the arbitration agreement renders the promise sufficiently binding to provide consideration. Aside from the fact that *Pierce* is not binding authority on this Court, the case is distinguishable because the agreement at issue not only required 10 days' notice to the employee of any modification, it also expressly provided that any amendment would not be effective "as to disputes … for which a proceeding ha[d] been initiated pursuant to the Rules." (quoting contract language). Unlike this case, the employer in *Pierce* expressly was limited to prospective amendment of the arbitration agreement. Contracts, like the

modification or abrogation by Bristol. Just as adding several zeros equals zero, adding several illusory promises equals an illusory promise.

10

arbitration agreement in this case, that permit unilateral, retroactive amendment are deemed illusory and do not constitute consideration to create an enforceable contract. *See Frye,* 321 S.W.3d at 442-445; *see also Morrow,* 273 S.W.3d at 20 (Ahuja, J., concurring) (quoting *Am. Laminates, Inc., v. J.S. Latta, Co.*, 980 S.W.2d 12, 23 (Mo. App. 1998)); *Carey v. 24 Hour Fitness, USA, Inc.*, 669 F.3d 202 (5th Cir. 2012) (provision permitting unilateral amendment to arbitration agreement by employer is an illusory promise; reasonable advance notice and language denoting prospective application of amendments are required). Consequently, Bristol's alleged mutual promise to arbitrate is not valid consideration to support the arbitration agreement.

### Conclusion

Baker's continued at-will employment and Bristol's promise to resolve claims through arbitration do not provide consideration to form a valid arbitration agreement. The judgment overruling appellant's motion to compel arbitration is affirmed.

_____
Richard B. Teitelman, Judge

Russell, C.J., Stith and Draper, JJ., concur;
Wilson, J., dissents in separate opinion filed;
Breckenridge and Fischer, JJ., concur in
opinion of Wilson, J.

11



Carla Baker, )
)
   Respondent, )
)
  v. ) No. SC93451
)
Bristol Care, Inc., d/b/a Bristol Manor, )
and David Furnell, )
)
   Appellants. )

## DISSENTING OPINION

The majority opinion holds there was only one agreement between Ms. Baker and Bristol Care concerning her employment as facility administrator. I agree. Even though the various promises between the parties are set forth in two separate documents, those documents were signed at the same time and the parties understood and agreed that, taken together, these documents reflected the terms on which Bristol Care offered – and Ms. Baker accepted – the promotion to facility administrator. She emphasizes this point in her brief, stating that she was "required to sign the employment agreement and the arbitration agreement as a condition of her employment." As this Court has recently held, "when several instruments relating to the same subject are executed at the same time …, *the documents will be construed together,* even in the absence of explicit incorporation, unless the realities of the situation indicate that the parties did not so

intend." *Johnson ex rel. Johnson v. JF Enterprises, LLC*, 400 S.W.3d 763, 767 (Mo.

banc 2013) (emphasis in the original) (internal quotation marks omitted).

Where I part company with the majority opinion, however, is its conclusion that

no contract[1] was formed between Ms. Baker and Bristol Care because there was no

consideration to make their respective promises legally binding. I disagree on this point

and, therefore, respectfully dissent.

## I. *Arbitration-Neutral Principles of Missouri Law Govern Questions of Contract Formation*

A promise to arbitrate can be part of a contract limited to that issue, or it can be

contained in a contract that addresses arbitration among many other terms. Here, as

Ms. Baker concedes (and the majority opinion holds), the contract between Ms. Baker

and Bristol Care – if one was formed – deals with arbitration only as one of the terms of

Ms. Baker's promotion to facility administrator. The enforceability of this arbitration

promise is controlled by the Federal Arbitration Act, 9 U.S.C. §§ 1-9 (the "FAA"), but

the FAA looks to state law to decide the threshold questions of contract formation. *First*

*Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Accordingly, Ms. Baker's

claim that none of the promises between the parties is enforceable due to a lack of

---

[1] To avoid confusion, this opinion uses the term "contract" to mean a legally enforceable promise or collection of promises. Every promise is not a contract, of course, and it is consideration (among other issues of contract formation) that turns a promise into a contract. Moreover, courts may refuse to enforce all or part of a contract even though the elements of contract formation are present. For example, a party may ask that a promise not be enforced because it is unconscionable or because it was induced by fraud. Such defenses are not questions of contract formation, however, and do not even arise until the question of formation is decided in favor of the party claiming the existence of the contract. Accordingly, the word "contract" in this opinion means only a promise or collection of promises as to which a contract has been formed, regardless of whether either party may have a valid defense to the enforcement of all or any one of those promises.

consideration raises a question of contract formation that must be resolved under Missouri law.

The FAA's deference to state law on questions of contract formation is not unlimited, however. Given that one of Congress's purposes in enacting the FAA was to overcome deeply entrenched judicial hostility toward arbitration contracts, *see AT&T Mobility LLC v. Concepcion*, 131 S.Ct. 1740, 1745 (2011), the FAA defers only to principles of state law that apply generally to all contracts. *See* 9 U.S.C. § 2 (providing that all arbitration promises "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract"). In other words, state law principles that purport to apply special rules for the formation of contracts containing promises to arbitrate are preempted by, and must be disregarded under, the FAA. *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987) (any "state-law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue does not comport with" § 2 of the FAA).

Accordingly, Ms. Baker's consideration claim must be analyzed only under principles of Missouri law that are "arbitration neutral," i.e., that treat all contracts the same regardless of whether they contain a promise to arbitrate. *Allied-Bruce Terminix Companies, Inc. v. Dobson*, 513 U.S. 265, 281 (1995) ("What States may not do is decide that a contract is fair enough to enforce all its basic terms (price, service, credit), but not fair enough to enforce its arbitration clause.").

3

## II.     *Consideration as an Element of Contract Formation*

Ms. Baker does not challenge the formation of her contract with Bristol Care on the basis that there was no mutual assent, i.e., offer and acceptance. The two documents plainly reflect the terms on which Bristol Care offered the promotion to facility administrator, and Ms. Baker's signatures evidenced her acceptance of and assent to those terms. Instead, she claims that no contract was formed between herself and Bristol Care as to those terms because there was no exchange of consideration to make their respective promises binding. Consideration, like mutual assent, is one of the basic elements of contract formation. *Nat'l Ref. Co. v. McDowell*, 201 S.W.2d 342, 347 (Mo. 1947) ("One of the essential elements of a contract is the consideration.").

There have been numerous opinions from this Court and others on the subject of consideration, and scholars have filled countless pages in their efforts to explain what those opinions mean. The subtle nuances in the application of this doctrine at the outer edges are as complex as any in the common law. *Corbin on Contracts* (1995), §§ 5.1 and 5.2, pp. 5-6 and 11-13. But no matter how much these nuances may thrill scholars, haunt courts, and torture first-year law students, they are unnecessary to the decision of this case. This case requires only the straightforward application of three basic principles of consideration that have been stated and applied by Missouri courts without hesitation or qualification for generations.

### A.     *A Bargained-For Exchange*

The first relevant principle of consideration is that it is a bargained-for exchange. In other words, when a promise is given in exchange for a benefit to the promisor, or in

4

exchange for a detriment to the promisee, this bargain supplies the consideration needed to form a contract. *State ex rel. Kansas City v. State Highway Comm'n*, 163 S.W.2d 948, 953 (Mo. banc 1942) ("consideration of a contract can consist either in a benefit conferred upon the promisor or in a legal detriment to the promisee"). In this way, consideration demonstrates the seriousness of the parties' bargain and provides assurance that they intended a promise to be enforceable in a court of law. *Corbin on Contracts* (1995), § 5.3, pp. 19-20.

Identifying a bargained-for exchange, therefore, is the key to determining whether consideration was given. "[C]onsideration may consist of some right, interest, profit or benefit accruing to [the promisor], or some forbearance, loss or responsibility given, suffered or undertaken by the [promisee]." *Perbal v. Dazor Mfg. Corp.*, 436 S.W.2d 677, 697 (Mo. 1968). When the consideration consists of a detriment to the promisee, this "means that the promisee changes his legal position; that is, that he gives up certain rights, privileges or immunities which he theretofore possessed or assumes certain duties or liabilities not theretofore imposed upon him." *Kansas City*, 163 S.W.2d at 953.

For example, consider the simple contract in which A promises to pay $100 to B if B mows A's lawn. When B mows the lawn, A's promise to pay is binding (i.e., a contract is formed) because A gave it in exchange for: (1) the ***benefit to A*** of having the lawn mowed (which A otherwise would not have received), or (2) the ***detriment to B*** of having mowed A's lawn (a chore B otherwise would not have performed).[2]

---

[2]  Confusion sometimes arises in the context of such unilateral contracts because the offeree's performance operates as both the ***acceptance*** of the offeror's offer and the ***consideration*** for the

The foregoing example is a unilateral contract because the offeror requires the offeree to manifest acceptance by tendering performance, not by making a promise to perform. In a bilateral contract, on the other hand, the offeree accepts by making the promise(s) sought by the offeror. Even though the nature of the exchange between the parties is different than in a unilateral contract, the consideration analysis remains the same. In both circumstances, the focus is on identifying a bargained-for exchange consisting of a benefit to the promisor or a detriment to the promisee.

For example, consider the following bilateral contract: A promises to pay $100 to B, and B promises to mow A's lawn. A's promise is supported by consideration because A gave it in exchange for: (1) the *benefit to A* of obtaining B's promise to mow the lawn (which A otherwise had no right to make B give), or (2) the *detriment to B* of undertaking the obligation to mow A's lawn (which B otherwise did not owe). At the same time, B's promise to A is supported by consideration because B gave it in exchange for: (1) the *benefit to B* of having A's promise of a $100 payment (which B otherwise had no right to make A give), or (2) the *detriment to A* of assuming the obligation to pay $100 to B (which A otherwise did not owe).[3]

_____

offeror's promise. For example, by mowing A's lawn (which B had no preexisting obligation to do), B manifests assent to A's offer and supplies the consideration to make A's promise binding. *Jensen v. McCall's Estate*, 426 S.W.2d 52, 57 (Mo. 1968); *Williston on Contracts*, § 1:17.

[3] Again, confusion can arise in bilateral contracts because one party's promise(s) may (or may not) be conditional or dependent upon the other party's performance. For example, A's obligation to pay $100 to B may not come due unless and until B mows (or substantially mows) A's lawn. But conditional or dependent promises are issues relating to breach and remedy, not contract formation. Because consideration is determined at the time promises are made, *Turner v. Sch. Dist. of Clayton*, 318 S.W.3d 660, 670 (Mo. banc 2010) (consideration "must be measured at the time the parties enter into their contract"), not performed, B's promise to mow

As this second example shows, bilateral contracts – by definition – are supported by consideration. "In any bilateral contract, each promise is the consideration for the other promise. Such is the bargain." *Corbin on Contracts* (1995), § 5.20, p. 102. "This has been true for at least four centuries, ever since bilateral contracts [as relative newcomers to the law of contracts] were recognized." *Id.* § 5.25, p.126 (citing cases from as early as 1555). This principle is equally well-rooted in Missouri law.

> It is the recognized general rule that a promise by one party to a contract is a sufficient consideration for a promise by the other party. If, therefore, there is a promise on the part of a purchaser to buy and pay the purchase price, this itself is a sufficient consideration for the promise of a vendor to sell and convey.

*Ragan v. Schreffler*, 306 S.W.2d 494, 499 (Mo. 1957). Thus, it is clear that it is not the price that supplies the necessary consideration but the offeree's promise to pay it.

Of course, not every promise will supply consideration. For example, a promise does not constitute consideration if the performance promised would not, itself, constitute consideration. *See* Restatement (Second) of Contracts, § 75 (a promise is not consideration when the promisor knows at the time the promise is made that the promise can be performed by an act that would not be consideration for a unilateral contract, e.g., payment of a preexisting debt). In the absence of such an exception, however, the general rule remains: a bargained-for exchange of promises supplies the consideration

---

A's lawn supplies the consideration to form a contract as to A's promise to pay $100 to B regardless of whether (or how well) B performs that promise. *See Corbin on Contracts* (1995), § 5.34, p. 192-94.

needed to bind both parties to their promises.[4]  *See Braudis v. Helfrich*, 265 S.W.2d 371,

372 (Mo. 1954) ("mutual promises constituted sufficient consideration for the bilateral

contract") (citing *Williston on Contracts*, § 103F, p. 347; and Restatement (First) of

Contracts, § 77, p. 86); *State ex inf. Miller v. St. Louis Union Trust Co.*, 74 S.W.2d 348,

356 (Mo. banc 1934) (in "bilateral contracts the consideration is a return promise")

(citing Restatement (First) of Contracts, § 75, p.82 (comment(d)); *Frye v. Speedway*

*Chevrolet Cadillac*, 321 S.W.3d 429, 438 (Mo. App. 2010) ("It is an elemental principle

of contract law that a contract that contains mutual promises imposing some legal duty or

liability on each promisor is supported by sufficient consideration to form a valid,

enforceable contract.") (internal quotation marks omitted).

### B.    Courts Do NOT Evaluate Consideration for "Adequacy"

The second relevant principle regarding consideration is that it requires no

qualitative analysis.  Consideration either is present (and a contract is formed), or it is

not.  Courts have no authority to attempt to value the bargained-for consideration in an

effort to determine whether the promisor is – or is not – receiving  "adequate" return for

the promise given.

> It is unnecessary that the consideration should be adequate in point of
> actual value, the law having no means to decide upon this matter.  If the

---

[4]  Because both parties to a bilateral contract are promisors and both are promisees, and because it is the exchange of promises that supplies consideration, it is essential that "each party has the right at once to hold the other to a positive agreement." *Huttig v. Brennan*, 41 S.W.2d 1054, 1062 (Mo. 1931).  "Mutuality of contract means that an obligation rests upon each party to do or permit to be done something in consideration of the act or promise of the other; that is, neither party is bound unless both are bound." *Aden v. Dalton*, 107 S.W.2d 1070, 1073 (Mo. 1937). Accordingly, either both parties are bound to their respective promises in their bilateral contract regarding Ms. Baker's promotion, or neither is bound.

> ***least benefit*** or advantage be received by the promisor from the promisee, or a third person, or if the promisee sustain any, the ***least injury*** or detriment, it will constitute a sufficient consideration to render the agreement valid.

*Marks v. Bank of Missouri*, 8 Mo. 316, 319 (1843) (emphasis added), *overruled on other grounds by Wild v. Howe*, 74 Mo. 551, 553 (1881).  *See also Weinstein v. KLT Telecom, Inc.,* 225 S.W.3d 413, 415-16 (Mo. banc 2007) (it is one of the "general principles of contract law that consideration must be measured at the time the parties enter into their contract"); *Sanger v. Yellow Cab Co.*, 486 S.W.2d 477, 480 (Mo. banc 1972) (a party "under no disability and under no compulsion may convey his property or relinquish his rights for as small consideration as he may decide"); *Brown v. Weare*, 152 S.W.2d 649, 653-54 (Mo. 1941) ("it is the policy of the law not to weigh the quantum of consideration, but, refraining from interference with the freedom of contract, suffer the parties to exercise freely their judgment … and determine for themselves the benefits derived from their bargains") (quotations and citations omitted); *Doss v. EPIC Healthcare Mgmt. Co.*, 901 S.W.2d 216, 220 (Mo. App. 1995) (where the "requirement of consideration [is] present … the law does not concern itself with the adequacy of the consideration"); *Hackett v. St. Joseph Light & Power Co.*, 761 S.W.2d 206, 212 (Mo. App. 1988) (same); *Haretuer v. Klocke*, 709 S.W.2d 138, 139 (Mo. App. 1986) ("in the absence of fraud, inadequacy of consideration is not a defense and the courts do not examine the adequacy of that consideration").

Accordingly, any bargained-for exchange will supply the consideration needed to form a contract, regardless of whether a court believes (with the benefit of hindsight) that

the promisor gave a promise that was worth more – even far more – than the benefit or detriment received in the exchange.[5] *See Sanger*, 486 S.W.2d at 480 (courts do not attempt to weigh or value consideration); Restatement (Second) of Contracts, § 79(b) ("If the requirement of consideration is met, there is no additional requirement of … equivalence in the values exchanged.").

Ms. Baker argues that grossly inadequate consideration may suggest that a contract is ***voidable*** due to fraud, duress, or unconscionability. *See Vondera v. Chapman*, 180 S.W.2d 704, 705 (Mo. 1944). This may be, but such defenses have nothing to do with contract formation. In fact, these defenses assume a contract was formed, i.e., that consideration was bargained for in exchange for each party's promise(s). *See* Restatement (Second) of Contract, § 208, comment c ("Inadequacy of consideration does not itself invalidate a bargain, but gross disparity … may be an important factor in a determination that a contract is unconscionable"); *Arthur Fels Bond & Mortg. Co. v. Pollock*, 149 S.W.2d 356, 359 (Mo. 1941) ("inadequacy does not constitute a failure of consideration").

---

[5] Even if courts (in hindsight) continue to indulge the now-preempted notion that arbitration is always "bad" for the employee and "good" for the employer, it does not follow that any employee agreeing to arbitrate her claims has made a bad bargain when viewed at the time the promise is made, as a consideration analysis demands. A reasonable employee might decide that promises relating to arbitration and other things which are uncertain ever to occur are easily given in exchange for promises concerning things such as pay and benefits that have an immediate and certain value to the employee.

### C. Separate Consideration is Not Needed for Each Contemporaneous Promise

The third relevant principle is that all contemporaneous promises by one party are deemed to have been given in exchange for the aggregate benefit to that party or the aggregate detriment to the other party. *See* Restatement (Second) of Contracts, at § 80(1) ("There is consideration for a set of promises if what is bargained for and given in exchange would have been consideration for each promise in the set if exchanged for that promise alone."); *Corbin on Contracts* (1995), § 5.12, p. 56 (same). Courts are not allowed to unravel the parties' bargain in hindsight, i.e., to allocate the consideration between and among some – but not all – of the promisor's undertakings, and then use the results of this exercise as a basis for refusing to enforce the entirety of the parties' bargain. Accordingly, there does not have to be separate consideration for each promise when a collection of promises is given in exchange for a collection of promises.

This principle likely is a corollary of the principle stated above, i.e., that courts cannot assess the value of the consideration in determining whether consideration existed.

> If one or more of several considerations, which are recited as the ground of a promise, be only frivolous and insufficient, but not illegal, and others are good and sufficient, then undoubtedly the considerations may be severed, and those which are void disregarded, while those which are valid will sustain the promise.

*Drummond Realty & Inv. Co. v. W.H. Thompson Trust Co.*, 178 S.W. 479, 482 (Mo. 1915) (quoting *Parsons on Contracts* (9th Ed.), Vol. 1, p.455). *See also Fullington v. Ozark Poultry Supply Co.*, 39 S.W.2d 780, 783-84 (Mo. 1931) ("If, without deciding, the recited purchase of stock is not a consideration supporting respondent's hiring of

11

appellant, the other consideration of mutual promises [to hire and to serve] is sufficient

….") (citing *Drummond Realty*); *Y.W. By & Through Smith v. Nat'l Super Markets, Inc.*,

876 S.W.2d 785, 791 (Mo. App. 1994) ("contract which has several items of

consideration, one sufficient and one insufficient, may be upheld on the strength of the

valid consideration") (citing Calamari & Perillo, *Contracts* (2d ed. 1977), § 4.23, Corbin,

*Corbin on Contracts* (1952), § 126); *Empire Gas Corp. v. Small's LP Gas Co.*, 637

S.W.2d 239, 246 (Mo. App. 1982) ("even if there be partial failure of consideration, yet if

there is a substantial consideration left it will be sufficient to sustain the contract") (citing

17 C.J.S. Contracts, §§ 129-30, pp. 848-852).

As noted, however, this principle applies only to contemporaneous promises.

When a party makes a new promise after a contract is formed, benefits or detriments

bargained for as part of the original contract cannot serve as consideration for the

subsequent promise. *Corbin on Contracts* (1995), § 7.1, p. 342. For example, this Court

held that there was no consideration to support an employee's promise not to compete

with the employer after his employment because the promise was given after – but during

the term of – the beginning of the employment contract. *Nat'l Motor Club of Mo., Inc. v.*

*Noe*, 475 S.W.2d 16, 21 (Mo. 1972) (no consideration because employee "did not get a

new position when he signed [the covenant not to compete], or anything new").

This distinction between multiple promises that are part of an initial contract and

subsequent promises was the focus of *Purcell Tire & Rubber Co. v. Executive Beechcraft,*

*Inc.*, 59 S.W.3d 505 (Mo. banc 2001). There, Purcell Tire hired Beechcraft to inspect a

plane Purcell Tire was considering buying. Their contract included a cap on Beechcraft's

12

liability to Purcell Tire in the event Beechcraft either failed to inspect the plane or failed to inspect it competently. In response to Purcell Tire's claim that this liability cap or waiver was invalid for lack of separate consideration, this Court noted the general rule that, when such a promise is made after the parties' initial contract is formed, new consideration is required to make that promise binding. *Id.* at 509. But Beechcraft's liability cap was part of the parties' original contract. Accordingly, the Court held that no new or separate consideration was required to make the cap enforceable against Purcell Tire because it was supported by the same consideration that made all of the other original terms enforceable. In other words, the liability cap was part of the original bargained-for exchange because "Beechcraft agreed to survey the plane – subject to a liability limitation – in exchange for Purcell Tire's payment of $1,250." *Id.* at 509-10.[6]

Accordingly, a promise to arbitrate need not be supported by separate consideration if it is made at the same time as other promises and those promises, viewed collectively, were supported by consideration. When several promises are given as part of a bargained-for exchange that results in any benefit to the promisor or any detriment to the promisee (or both), a contract is formed with respect to all of the promises made.

---

[6] *See also Migar Enterprises, Inc. v. DeMent*, 817 S.W.2d 911, 913 (Mo. App. 1990) (covenant not to compete in contract selling business was supported by consideration because, "[w]hile the contract stated no separate consideration for the non-competition agreement, the $25,000 purchase price was sufficient consideration to support the same"); *Ashland Oil, Inc. v. Tucker*, 768 S.W.2d 595, 601 (Mo. App. 1989) ("Clearly, promotions, additional responsibility, and pay increases constitute adequate consideration in support of the validity of the service agreement," including the promise not to compete made in that agreement.); *City Ice & Fuel Co. v. Snell*, 57 S.W.2d 440, 442 (Mo. App. 1933) ("it is now well established by the decisions of our Supreme Court and appellate courts that contracts [with non-compete provisions] similar to the one in this case are based upon a sufficient consideration, namely, the mutual promises of the parties").

### III. *There was Consideration for the Parties' Exchange of Promises*

Prior to her promotion as facility administrator, Ms. Baker worked as an hourly (i.e., "non-exempt") employee pursuant to a simple unilateral contract. Bristol Care promised to pay a specified wage if Ms. Baker worked – not promised to work – in Bristol Care's facilities. That contract was terminable at any time by either party. The agreement with respect to Ms. Baker's promotion to facility administrator, however, was quite different. As Ms. Baker concedes, she was "required to sign the employment document and the arbitration document as a condition of her employment" as facility administrator. The following is a list of some, though not all, of the promises each party made to the other at the outset of their new arrangement.

#### *Bristol Care promised:*

- To employ Ms Baker as the Administrator of its facility for an indefinite term, subject to its right to terminate her employment: (a) without notice for certain specified grounds, and (b) with either five days' notice or five days' pay in all other circumstances

- To pay Ms. Baker a monthly salary for her services

- To advance, without interest, $350 to Ms. Baker in the middle of each month against her salary, which was to be paid at the end of each month

- To pay Ms. Baker a bonus if specified financial targets are met, the amount of which would be increased or decreased based on Ms. Baker's performance, though Bristol Care retained the right to eliminate the bonus program without notice

- To allow Ms. Baker a specific number of paid vacation days during her first three and a half years of service and, thereafter, in accordance with company policy

- To provide Ms. Baker (and one approved co-habitant) with living accommodations in the company's facility during her employment and subject to stated limitations

- To provide all utilities, including basic cable television, for Ms. Baker's living accommodations

- To arbitrate, with specified exceptions, all claims or controversies Ms. Baker may have against the company arising out of, relating to, or in association with her employment

- To arbitrate, with specified exceptions, all claims or controversies the company may have against Ms. Baker arising out of, relating to, or in association with her employment

- To initiate and conduct the arbitration of such claims before a single arbitrator using the procedures (including the arbitrator selection procedures) in the American Arbitration Association's Rules for the Resolution of Employment Disputes in effect at the time the claim is filed

- To pay all arbitration fees, including the arbitrator's fees and expenses, except for the filing fee for claims initiated by Ms. Baker or the fees and expenses of Ms. Baker, her attorney, and her witnesses

- To maintain the confidentiality of the existence, subject, and results of any arbitration with Ms. Baker

*Ms. Baker promised:*

- To serve as Administrator in Bristol Care's facility for an indefinite period, subject to her right to terminate this employment with 60 days prior notice

- To operate the facility in accordance with state rules and regulations governing residential care facilities, as well as the Bristol Care's Administrative Guide and other policies, and to manage facility staff in accordance with the Bristol Care Employee Handbook

- To refrain, during her employment and for a period of two years thereafter, from disseminating any of Bristol Care's confidential information to individuals outside the company

- To refrain, during her employment and for a period of two years thereafter, from soliciting or rendering residential care services to persons who were (a) residents of the facility during the last year of Ms. Baker's employment, or (b) solicited to become residents by Ms. Baker during the last six months of her employment

- To refrain, during her employment and for a period of two years thereafter, from disrupting or interfering with contractual or other relationships between Bristol Care and its residents, managers or vendors

- To abide by the policies of Bristol Care and the State of Missouri concerning residents' rights and the handling of residents' funds, and to refrain (and ensure that all hourly employees at the facility and all of Ms. Baker's relatives residing with her at the facility refrain) from engaging in specified transactions with residents

- To arbitrate, with specified exceptions, all claims or controversies Bristol Care may have against her arising out of, relating to, or in association with her employment

- To arbitrate, with specified exceptions, all claims or controversies she may have against Bristol Care arising out of, relating to, or in association with her employment

- To initiate and conduct the arbitration of such claims before a single arbitrator using the procedures (including the arbitrator selection procedures) in the American Arbitration Association's Rules for the Resolution of Employment Disputes in effect at the time the claim is filed

- To maintain the confidentiality of the existence, subject, and results of any arbitration with Bristol Care

Applying the principles set forth above, the exchange of promises in this bilateral contract supplies consideration to make all of the parties' promises binding. Ms. Baker concedes that she signed the two agreements – and thus made each of the promises memorialized in those agreements – in order to receive the collection of promises Bristol Care was making to her (e.g., the promotion and related benefits). By the same token, Bristol Care made its collection of promises in exchange for the collection of promises Ms. Baker made. The amount of consideration is immaterial because any bargained-for exchange of benefits or detriments, no matter how small, supplies the consideration needed to make these promises binding.

### A. No Separate Consideration Needed for Ms. Baker's Arbitration Promise

Ms. Baker contends that her promise to arbitrate specified claims against Bristol is not enforceable because that promise was not supported by separate consideration. As explained in Section B, below, this argument is contrary to this Court's decision in *Purcell Tire*, 59 S.W.3d at 509, because it ignores the fact that Ms. Baker's arbitration

16

promise was just one of the many promises that Bristol Care bargained for – and she gave – in order to receive the promotion to facility administrator and accompanying benefits. But, even though Ms. Baker's claim is based on a faulty premise, it is worth noting that her claim still cannot succeed.

### 1. Bristol Care Agreed to Arbitrate Ms. Baker's Claims

Even if the Court were to treat Ms. Baker's promise to arbitrate as though it was made after – and not as part of – the parties' broader exchange of promises regarding her promotion to facility administrator (which she concedes it was), that promise was supported by consideration. In exchange for her promise to arbitrate any specified claims that she may have against Bristol Care, Ms. Baker received Bristol Care's promise to arbitrate her claims as well.[7]

As a result of this bargained-for exchange, therefore: (1) Ms. Baker received the benefit of access to a process that is (or that she reasonably could have expected it could be) quicker and less expensive than resorting to the administrative review and civil litigation procedures to which she otherwise was limited, and (2) Bristol Care incurred the detriment of agreeing prospectively to waive its right to a jury trial on whatever specified claims Ms. Baker may assert against it and, instead, submit to her arbitration process and abide by its results. Even viewed in isolation, therefore, this Court's

---

[7] In *State ex rel. Vincent v. Schneider*, 194 S.W.3d 853 (Mo. banc 2006), this Court upheld a one-sided arbitration agreement and rejected claims that it was unenforceable for lack of "mutuality." The Court characterized such "mutuality of obligations" arguments as "a dead letter in contract law." *Id.* at 858. Instead, the Court held that as "'long as the requirement of consideration is met, mutuality of obligation is present, even if one party is more obligated than the other.'" *Id.* at 859 (quoting *Harris v. Green Tree Fin. Corp.*, 183 F.3d 173, 181 (3d Cir. 1999)).

17

precedents and the basic principles of consideration require this Court to hold that Ms. Baker's arbitration promise is supported by consideration.

To hold otherwise is to say that mutual promises are not valid consideration, a conclusion that is contrary to every case and treatise on the subject. Worse, to find that there was no consideration for Ms. Baker's promise is to say that there was ***absolutely no*** benefit to Ms. Baker in being able to arbitrate whatever claims she may have against Bristol Care in the future and ***absolutely no*** cost to Bristol Care in obligating itself to that process and its results. These conclusions cannot be justified either by the fact that Ms. Baker has changed her mind about wanting to arbitrate her claims or by any lingering judicial hostility toward arbitration generally. The former is contrary to law, *see Turner*, 318 S.W.3d at 670 (consideration "must be measured at the time the parties enter into their contract"), and the latter is the sort of judicial hostility to arbitration that the FAA now preempts. Accordingly, even if the Court ignores all of the other benefits to Ms. Baker and detriments to Bristol Care in the "Mandatory Arbitration Agreement" (not to mention the remainder of the promises that comprise the parties' entire contract) and focuses solely on her promise to arbitrate specified claims against Bristol Care, there is sufficient benefit to Ms. Baker and detriment to Bristol Care to make that promise binding.

### 2. *Bristol Care Also Agreed to Arbitrate Its Specified Claims*

Such a narrow focus cannot be justified, however. Even ignoring all of the parties' promises regarding Ms. Baker's promotion, there was a substantial exchange of promises between the parties in the "Mandatory Arbitration Agreement." Bristol Care

18

not only promised to arbitrate any specified claims that Ms. Baker may assert against it, but Bristol Care also promised to arbitrate any specified claims it may wish to assert against her. This Court already has held that arbitration promises need not be mutual in this way to make an exchange of promises to arbitrate only one party's claims enforceable, *see Schneider*, 194 S.W.3d at 859, but the willingness of Bristol Care and Ms. Baker to exchange mutual arbitration promises surely supplies the consideration needed to make those promises binding.

And those are not the only promises Ms. Baker and Bristol Care exchanged in the "Mandatory Arbitration Agreement." Both agreed to keep the existence, subject matter, and results of any future arbitration between them confidential. Because neither party was required to pledge such confidentiality, the benefit and detriment to each party of the mutual promises to do so supplies the consideration needed to make those promises binding. And, if there is consideration for any one promise, that consideration extends to all of the contemporaneous promises by that party.

Similarly, both parties agreed to abide by the American Arbitration Association's Rules for the Resolution of Employment Disputes (renamed by the AAA as the "Employment Arbitration Rules and Mediation Procedures") in effect at the time a claim is filed. Because neither party was obligated to agree to these rules, the benefit and detriment to each party of their mutual promises to do so supplies the consideration needed to make those promises – and all other contemporaneous promises in the arbitration agreement – binding.

Finally, Bristol Care agreed to pay all of the costs of the arbitration, including the arbitrator's fees and expenses. As a result, Ms. Baker would be obligated to pay only the initial filing fee for any arbitration she may initiate (plus the fees and expenses of any attorneys and/or witnesses she may choose to employ). As noted above, Bristol Care had no preexisting obligation to assume this uneven share of the costs, and its promise to do so supplies the consideration needed to form a contract on all of the promises made by Ms. Baker in return.

### 3. *Bristol Care's Arbitration Promises are Not Illusory*

Ms. Baker argues that none of Bristol Care's promises in the "Mandatory Arbitration Agreement," nor the combined effect of all of those promises, supplies consideration for the promises she made in that agreement. Because Ms. Baker agreed to give Bristol Care the right to "amend, modify or revoke this agreement upon thirty (30) days' prior written notice to the Employee," she now insists that right renders all of Bristol Care's promises illusory.

Bristol Care counters that, because it is bound to give written notice 30 days before any change, it agreed to be bound by the "Mandatory Arbitration Agreement" for at least 30 days. In addition, Bristol Care emphasizes that both parties agreed to be bound by the AAA rules in effect at the time a claim was filed and, therefore, Bristol Care had no right to alter the agreement as to any claim pending at the time of – or filed within 30 days after – any notice from Bristol Care that it was intending to change the agreement.

20

There is no question that the construction of this provision that Bristol Care offers is the one this Court would adopt if Bristol Care were trying to realize a retrospective advantage from some unilateral alteration to the agreement. Nor is there any question that the construction volunteered by Bristol Care now is the one that any court would adopt in the future should Bristol Care try to alter its obligations to Ms. Baker under this agreement with respect to the claims she has already asserted. Accordingly, there is no justification for refusing to adopt this construction here, especially when the consequences of that refusal is that *none* of the promises made by either party – not just in the "Mandatory Arbitration Agreement" but on any aspect of her promotion to facility administrator – will be enforceable. *See Perbal*, 436 S.W.2d 677, 689 (Mo. 1968) ("Where an agreement is susceptible of two constructions, one of which renders the contract invalid and the other sustains its validity, the latter construction is preferred"); *In re Binghamton Bridge*, 70 U.S. 51, 74 (1865) ("It is not the duty of a court, by legal subtlety, to overthrow a contract, but rather to uphold it and give it effect").

Even if the Court is unwilling to read the "Mandatory Arbitration Agreement" as both parties plainly intended it to be read from the outset, however, this does not mean that Bristol Care's promises are illusory and Ms. Baker's arbitration promise is not binding. Instead, in section 25 of the parties' arbitration agreement, Ms. Baker and Bristol Care expressly agreed that this Court can – and should – "*modify* … it to render it enforceable." [Emphasis added.] Accordingly, the Court should simply modify the "Mandatory Arbitration Agreement" to provide that no change to the agreement by Bristol Care can alter Ms. Baker's rights under the agreement with respect to any claim

21

after she has asserted it. Both parties plainly desired the Court to make such a modification at the time they entered into this agreement, and this Court cannot now refuse to make the agreement enforceable with this modification merely because Ms. Baker no longer wants it to do so.

### B.     The Parties' Broad Exchange of Promises Supplies Consideration

Finally, as noted above, Ms. Baker's efforts to focus the Court's consideration analysis solely on her arbitration promise in the "Mandatory Arbitration Agreement," or even on the parties' exchange of arbitration and arbitration-related promises in that document, misses the forest for the trees. Ms. Baker admits that the arbitration agreement document was one of *two* documents she was "required to sign" in order to receive her promotion to facility administrator and the pay increase and other benefits that came with this new job. Her arbitration promise, therefore, was only one small part of a much larger give-and-take. Neither she nor this Court is free now – in hindsight – to dissect the parties' bargain and declare that one of the many promises she made cannot be enforced because of a lack of consideration.

If Ms. Baker's arbitration promise had been made after – and not as part of – the parties' exchange of promises, it nevertheless would be enforceable because it was given in exchange for one or more of Bristol Care's arbitration and arbitration-related promises under the analysis in the preceding section. Otherwise, her promise would not be enforceable under this Court's decision in *Noe*, 475 S.W.2d at 21. But, as explained in *Purcell Tire*, such an analysis is not necessary when the promise is given as part of an original exchange of promises between the parties. *Purcell Tire*, 59 S.W.3d at 509. The

22

Court is bound by *Noe* and *Purcell Tire* and cannot reach a different conclusion merely because the promise at issue involves arbitration rather than a liability cap or a covenant not to compete. *Perry*, 482 U.S. at 492 n.9 (the FAA preempts any "state-law principle that takes its meaning precisely from the fact that a contract to arbitrate is at issue").

### 1. **Morrow** *is Irrelevant*

In an effort to avoid the obvious and unavoidable conclusions of a consideration analysis focusing on the multifaceted exchange of promises between her and Bristol Care regarding her promotion to facility administrator, Ms. Baker relies heavily on *Morrow v. Hallmark Cards, Inc.*, 273 S.W.3d 15 (Mo. App. 2008). But *Morrow* is the antithesis of this case and provides no authority for her position.

In *Morrow*, the plaintiff had been working for Hallmark for nearly 20 years when the company unilaterally imposed a dispute resolution program (including arbitration) covering all employees and all claims against the company. Hallmark notified its employees that anyone who continued to work for the company after the effective date of the new program would be deemed to have agreed to be bound by it. Ms. Morrow did so and, when she later filed a lawsuit against Hallmark arising out of her termination, the trial court compelled her to arbitrate that claim. Following arbitration, Ms. Morrow sought to vacate what she claimed was an inadequate award on the ground that there was no consideration for her promise to arbitrate. The court of appeals agreed. *Id.* at 27. Regardless of whether the analysis in *Morrow* was proper, it sheds no useful light on the issues in this case.

23

First, in *Morrow*, the question was whether plaintiff's continued employment – and nothing more – could supply the both the assent and the consideration needed to make an implied arbitration promise binding. Ms. Morrow's arbitration promise was not given in exchange for a promotion, new duties, or a pay raise as part of the type of bargained-for exchange in which Ms. Baker made her arbitration promise. In fact, *Morrow* stresses that the only reason a consideration analysis was needed was that there were no contemporaneous promises by the employer in exchange for the employee's arbitration promise. *Id.* at 24-25 ("When a contract is ***not bilateral*** (when promises do not ***flow both ways***), there must be good and sufficient consideration flowing from the non-promising party to support the contract.") (emphasis added).

Second, even in the absence of any bargained-for exchange of employment-related promises from Hallmark, *Morrow* acknowledges there would have been consideration for the employee's arbitration promise if Hallmark had made an arbitration promise in return. Hallmark did not promise to arbitrate its claims against employees, but Bristol Care ***did***. *Id.* at 25. Even the "promise by Hallmark to participate in arbitrating employee claims or in paying arbitrator fees" was not sufficient to supply the needed consideration because Hallmark had reserved the right to make changes – ***with no prior notice*** – to any and all aspects of the new policy. *Id.* Again, Bristol Care agreed to give what Hallmark did not - prior written notice.

Because Hallmark made no arbitration-related promises to Ms. Morrow that were not illusory, and because it had made no other promises to Ms. Morrow contemporaneous with and in exchange for her arbitration promise, *Morrow* turned on a single question:

24

whether the mere continuation of employment – with no new benefit to the employee or detriment to the employer – supplied consideration to make the employee's arbitration promise binding. *Id.* at 27. Not only is that question not dispositive in the present case (as it was in *Morrow*), it is not even relevant.

Mr. Baker's arbitration promise was one of many express promises she gave in order to receive the promotion Bristol Care offered. It bears no resemblance to Ms. Morrow's arbitration promise, which she never made expressly and which could be implied only because she continued to work the same job for the same pay that she had worked before Hallmark demanded the unilateral arbitration promise from her. Here, Bristol Care made a collection of promises to Ms. Baker (e.g., a promotion, a pay raise, living quarters, and its agreement to arbitrate all specified claims against her or by her) in order to obtain the collection of promises she made to it (e.g., to serve as a facility administrator, not to quit without 60 days' notice, not to compete, and to arbitrate all specified claims against it or by it). In *Morrow*, Hallmark did not promise anything to the employee except to pay her the same amount for the same work she had done before.

### 2. Bristol Care's Employment Promises are Not Illusory

Ms. Baker tries to make *Morrow* relevant by arguing that she, too, was an "at will" employee even after her promotion to facility administrator. In other words, because she contends (now, at least) that Bristol Care could have terminated her employment at any time and for any reason, she maintains that all of Bristol Care's promotion-related promises were illusory and, therefore, cannot supply the consideration needed to make her arbitration promise binding. This is a severe distortion of *Morrow* and an assertion

supported by no other case or principle of contract law. *See Corbin on Contracts*, § 6.13, pp. 309-10 (when "one party shall have the power to terminate by notice given for some stated period … the contract should never be held to be rendered invalid thereby for lack of 'mutuality' or for lack of consideration"); and § 6.14, pp. 313-14 ("same is true of a promise in which the promisor reserves the power to terminate for good cause").

*Morrow* does not hold that the arbitration-related promises Hallmark made to the employee in exchange for her arbitration promise were illusory because the employee was an "at will" employee. *Morrow* holds that those promises were illusory because Hallmark could modify them at any time with no prior notice. *Morrow*, 273 S.W.3d at 25. The reference in *Morrow* to the employee's "at will" status, on the other hand, was solely in the context of rejecting the idea that continuing such employment – by itself – could supply consideration when Hallmark could terminate that employment at any time.

Moreover, *Morrow* recognizes that, for employment not to be "at will," the employment contract must contain a specific duration for the employment or "the contract must be one that ***places limits on the employer's rights*** to discharge at will." *Id.* at 26 (emphasis added). Ms. Morrow had no written employment contract and no basis for claiming any such restrictions on Hallmark's common law rights to discharge her at will. Here, on the other hand, there was an extensive written employment agreement between Bristol Care and Ms. Baker in which Bristol Care agreed to limitations on those common law rights. It agreed, with specified exceptions, not to terminate Ms. Baker without five days' notice or five days' pay, neither of which it would owe under common law. As a result, Ms. Baker's argument that an "at will" employee can still be entitled to

severance pay misses the point. It is not the nature of the limitations on Bristol Care's common law rights that matters; it is the fact that those limitations remove its promises from the dustbin of "illusory promises" such that they supplied the consideration needed to bind Ms. Baker to her promises for which Bristol Care gave its promises in exchange.

### 3. Missouri Law Recognizes Continued Employment as Consideration

Even if Ms. Baker were an "at will" employee under the definition in *Morrow* despite the limitations on its common law rights to terminate her to which Bristol Care agreed (and plainly she was not), this Court has never held that such an arrangement fails to supply the consideration needed to make an employee's promises given in exchange for such employment binding, at least to the extent of the employment actually provided. Moreover, lower courts have rejected that argument repeatedly. *See JumboSack Corp. v. Buyck*, 407 S.W.3d 51, 55-56 (Mo. App. 2013) ("Missouri courts have recognized that continued at-will employment constitutes consideration for a non-compete agreement where the employer allows the employee 'by virtue of the employment[,] to have *continued access* to [its] protectable assets and relationships.'") (emphasis in original).

In *Computer Sales Int'l, Inc. v. Collins*, 723 S.W.2d 450 (Mo. App. 1986), the court applied this principle, holding:

> At all times during Collins' employment, Collins remained an employee at will who could have been terminated by Computer Sales for any reason at any time. In fact, Computer Sales had previously terminated a marketing representative who had refused to sign the covenant. The continuation of Collins' employment for approximately 2½ years after he signed the restrictive covenant provides consideration for the covenant.

*Id.* at 451-52. In *Reed, Roberts Associates, Inc. v. Bailenson*, 537 S.W.2d 238 (Mo. App. 1976) , the court explained further:

> A continuance by employee in the employment of employer where he is under no obligation to remain and the continuance by the employer of the employment where continuance is not required supplies adequate consideration for a secondary contract.

*Id.* at 241.

"This view is consistent with Missouri law, and with prevailing authority generally." *Ranch Hand Foods, Inc. v. Polar Pak Foods, Inc.*, 690 S.W.2d 437, 442 (Mo. App. 1985) (employee's continued work, including a promotion and pay increase, was consideration for his non-compete promise ). *See Easy Returns Midwest, Inc. v. Schultz*, 964 S.W.2d 450, 454 (Mo. App. 1998) ("employee's continuance in employment with employer, where there is no obligation to remain, and an employer's continuance of employment, where continuance is not required, supplies adequate consideration for a noncompetition agreement"); *Cook v. Coldwell Banker*, 967 S.W.2d 654, 657 (Mo. App. 1998) ("unilateral contract lacks consideration for want of mutuality, but when the promisee performs, consideration is supplied, and the contract is enforceable to the extent performed").

Missouri courts cannot apply one rule to an employee's non-compete promises but apply a different rule if the case involves an employee's arbitration promise. "A court may not, then, in assessing the rights of litigants to enforce an arbitration agreement, construe that agreement in a manner different from that in which it otherwise construes nonarbitration agreements under state law." *Perry*, 482 U.S. at 492 n.9.

States may regulate contracts, including arbitration clauses, under general contract law principles and they may invalidate an arbitration clause 'upon such grounds as exist at law or in equity for the revocation of *any* contract.' 9 U.S.C. § 2 (emphasis added). What States may not do is decide that a contract is fair enough to enforce all its basic terms (price, service, credit), but not fair enough to enforce its arbitration clause. The Act makes any such state policy unlawful, for that kind of policy would place arbitration clauses on an unequal 'footing,' directly contrary to the Act's language and Congress's intent.

*Doctor's Associates, Inc. v. Casarotto*, 517 U.S. 681, 686 (1996) (quoting *Allied-Bruce*, 513 U.S. at 281).

As explained above, the Court need not concern itself with *Morrow* in this case because it decided different legal issues on highly dissimilar facts. But, to the extent Ms. Baker succeeds in bringing that case into the Court's analysis, the Court cannot adopt its conclusions. It is not that the Court should not do so, though that is true as well. It is that the Court cannot do so. Decades of decisions rejecting *Morrow*'s holding outside the context of arbitration promises show that any effort by this Court to follow *Morrow* in the present case involving an arbitration promise is, in reality, merely the application of a special rule regarding consideration in employment contracts involving arbitration promises. The FAA, as construed in *Casarotto*, *Perry*, and *Allied-Bruce*, precludes the application of such a rule.

*IV.* *Conclusion*

For the reasons set forth above, I would hold that Ms. Baker's arbitration promise was supported by consideration and, therefore, should be enforced pursuant to Bristol Care's motion and the FAA. Because the majority opinion allows Ms. Baker to litigate her claim in state court despite her having promised not to do so, I respectfully dissent.

_____
Paul C. Wilson, Judge